

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | Criminal No. 4:16-CR-234 |
| v. | § | |
| | § | **UNDER SEAL** |
| GWENDOLYN ARNETTA GIBBS, | § | |
|   a.k.a. GWENDOLYN ARNETTA | § | |
|   GUIDRY; | § | |
| CHARLES JOSEPH GUIDRY, JR.; and | § | |
| JUSTINA OBUMNADOR UZOWULU, | § | |
| | § | |
| Defendants. | § | |

United States Courts
Southern District of Texas
FILED

DEC 1 2 2017

David J. Bradley, Clerk of Court

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Second Superseding Indictment, unless otherwise specified:

The Medicare Program

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were 65 years old or older, or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2.      Medicare was subdivided into multiple Parts.  Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness.  The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3.     Patients eligible for Medicare coverage of a PHP comprised two groups:  (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is in lieu of continued inpatient treatment; and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4.     Medicare guidelines required that patients admitted to a PHP required PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5.     Under the PHP benefit, Medicare covered the following services:  (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose was the treatment of the patient's condition; (7) patient education programs, where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6.     Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7.     Medicare did not cover programs providing primarily social, recreational or diversionary activities.  Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation.  Psychosocial programs that provided only a structured environment, socialization, or vocational rehabilitation were not covered by Medicare.

8.      Medicare required that the PHP was provided at a facility that was hospital-based or hospital-affiliated or at a community mental health center ("CMHC").

9.      Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10.     Hospitals, physicians, and other healthcare professionals that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11.     Medicare paid hospitals, CMHCs, and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12.     CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer") and later Novitas Solutions, Inc. ("Novitas").

13.     To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified that: (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14.     A Medicare claim for PHP reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the item or service provided to the beneficiary, the date the item or service was provided, the cost of the item or service, and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

The Medicaid Program

15.     Medicaid was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965.  The State of Texas and the federal government shared the cost of funding the Texas Medicaid Program.  The Medicaid program helped pay for reasonable and necessary medical procedures and services provided to individuals who were deemed eligible under state low-income programs.  Medicaid was "a health care benefit program" as defined by Title 18, United States Code, Section 24(b).

16.     The State of Texas contracted with Texas Medicaid and Healthcare Partnership ("TMHP") to process claims submitted by physicians and other health care providers for individuals who received benefits paid for by Medicaid.

17.     In order to receive reimbursement from Medicaid, a provider was required to submit an application, in which the provider agreed to comply with all Medicaid-related laws and regulations.  If the provider met certain minimum qualifications, Medicaid approved the application and the provider was issued a unique identification number also known as a "provider number."  The provider was then allowed to submit bills for services known as "claims" to Medicaid for reimbursement for the cost of providing medically necessary services to Medicaid beneficiaries.

18.     Upon assignment of a Medicaid provider number, a current Texas Medicaid Provider Procedures manual was distributed to the provider. Updates to the procedure manual were included in the Texas Medicaid Bulletins, which were distributed to the provider by TMHP and available online. The procedure manual, bulletins, and updates detailed the rules and regulations pertaining to services covered by Medicaid and how to appropriately bill for providing services to recipients.

19.     Medicaid permitted approved providers to submit Medicaid claims on paper or electronically. Medicaid required that submitted claims contain the following details: the Medicaid beneficiary's name and Medicaid identification number; the service that the provider provided; the amount of time, billed in 15-minute units; the date of service; and the charge for the service provided. Medicaid required providers to provide the services to the beneficiary prior to submitting a claim for payment to Medicaid.

20.     The Medicaid Program in Texas may pay a portion of a claim originally submitted to Medicare in the event the patient has both Medicare and Medicaid coverage. This portion is generally twenty (20) percent of the Medicare allowance for the billed charge. Such claims are sent to Medicaid once processed by Medicare. Medicaid will pay its portion if Medicare originally allowed the claim.

21.     Medicaid paid for some types of psychiatric services, but not PHP services. Additionally, the Texas Department of Aging and Disability Services ("DADS") supervised a program called Home and Community Based Services ("HCS"), which provided individualized services and support to qualifying Medicaid beneficiaries with intellectual disabilities who lived at home, in the community, or in small group homes.

Entities and Defendants

22.     Daybreak Rehabilitation Center ("Daybreak") was a CMHC doing business in or around Houston, Texas.  Daybreak billed Medicare and Medicaid for PHP and psychiatric services purportedly provided at Daybreak.

23.     Defendant **GWENDOLYN ARNETTA GIBBS**, a.k.a. **GWENDOLYN ARNETTA GUIDRY ("GWENDOLYN GIBBS")**, a resident of Fort Bend County, Texas, owned, operated, or controlled Daybreak and other entities, including Daybreak Home Health Nursing Services and Gibbs Care Home, Inc. ("Gibbs Care Home").

24.     Defendant **CHARLES JOSEPH GUIDRY, JR. ("CHARLES GUIDRY")**, a resident of Harris County, Texas, was a Licensed Baccalaureate Social Worker (LBSW), and co-owned, operated, or controlled Daybreak.

25.     Defendant **JUSTINA OBUMNADOR UZOWULU ("JUSTINA UZOWULU")**, a resident of Fort Bend County, Texas, owned group homes under the name Better Life Assisted Living, and periodically sent her residents to Daybreak and other PHPs.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C. § 1349)**

26.     Paragraphs 1 through 25 of this Second Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

27.     From in or around January 2007 through in or around April 2016, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants,

**GWENDOLYN ARNETTA GIBBS,**
**a.k.a GWENDOLYN ARNETTA GUIDRY;**
**CHARLES JOSEPH GUIDRY, JR.; and**
**JUSTINA OBUMNADOR UZOWULU**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items, and services.

## Purpose of the Conspiracy

28.    It was a purpose and object of the conspiracy for **GWENDOLYN GIBBS, CHARLES GUIDRY, JUSTINA UZOWULU,** and their co-conspirators, known and unknown, to unlawfully enrich themselves by, among other things: (a) submitting false and fraudulent claims to Medicare and Medicaid through Daybreak and its related entities for services that were often medically unnecessary, ineligible for Medicare and Medicaid reimbursement, and often not provided; (b) offering and paying kickbacks and bribes to patient recruiters, group home owners, and others in exchange for those recruiters and group home owners sending Medicare and Medicaid beneficiaries to Daybreak and its related entities for psychiatric services that were often medically unnecessary, not provided, or both; (c) concealing the submission of false and fraudulent claims to Medicare and Medicaid and the payment of kickbacks and bribes to patient recruiters, group home owners, and others; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators and family members.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

29.     **GWENDOLYN GIBBS** maintained Medicare and Medicaid provider numbers for Daybreak that the defendants and their co-conspirators used to submit and cause to be submitted claims to Medicare and Medicaid for PHP and psychiatric services.

30.     As Administrator, Director, Owner, and CEO of Daybreak, **GWENDOLYN GIBBS** oversaw Daybreak's operation.

31.     **CHARLES GUIDRY** managed and controlled the day-to-day operations at Daybreak.

32.     **GWENDOLYN GIBBS, CHARLES GUIDRY**, and their co-conspirators, including their family members, owned and operated several group homes, in which Medicare and Medicaid beneficiaries lived.  Residents of these group homes were often transported to Daybreak during the day, sometimes by ambulance, where they purportedly received partial hospital services.

33.     Medicare beneficiaries C.Z. and J.Z., who were also Medicaid recipients, resided in a group home or an apartment owned or controlled by **GWENDOLYN GIBBS**. **GWENDOLYN GIBBS** was C.Z. and J.Z.'s caretaker and was designated the Representative Payee for C.Z and J.Z.'s Social Security Income.  **GWENDOLYN GIBBS** submitted and caused the submission of claims to Medicare and Medicaid for psychiatric services purportedly provided to C.Z. and J.Z., often while simultaneously receiving money for C.Z. and J.Z. through the HCS program, a Medicaid waiver program.

34.     **JUSTINA UZOWULU** owned and operated group homes in the Houston area under the name Better Life Assisted Living, in which Medicare and Medicaid patients resided.

35.     To obtain Medicare and Medicaid patients, **CHARLES GUIDRY** oversaw the payment of healthcare kickbacks to patient recruiters, group home owners—including **JUSTINA**

UZOWULU—and others in exchange for their sending Medicare and Medicaid beneficiaries to Daybreak for partial hospital services that were often medically unnecessary, often not provided, or both.

36.     **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators paid and caused the payment of kickbacks to patient recruiters, group home owners—including **JUSTINA UZOWULU**—and other providers in the form of cash, checks, and money orders; food vouchers; daily meals and supervision at Daybreak, which saved group home owners money and time; and other incentives, in exchange for their sending Medicare and Medicaid beneficiaries to Daybreak for partial hospital services that were often medically unnecessary, often not provided, or both.

37.     Group home owners, including **JUSTINA UZOWULU**, moved their patients from one PHP to another, often in exchange for money, including to and from Daybreak, for no medical reason.

38.     **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators paid and caused the payment of kickbacks and bribes to Medicare and Medicaid beneficiaries in the form of cigarettes, cash, food, and other incentives, in exchange for those beneficiaries' attending Daybreak's PHP.

39.     **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators falsified and caused to be falsified patient files to make it appear that services for which Daybreak billed Medicare and Medicaid were medically necessary and met Medicare's criteria for reimbursement.

40.     In part to maintain control over the Medicare and Medicaid beneficiaries that attended Daybreak, **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, their co-conspirators, and

family members opened other entities, including Gibbs Care Home; Procare Community Resources, Inc.; Remedi Plus, Inc., and Visionaire Plus, Inc., which purported to provide Medicare or Medicaid services, and were funded by Medicare or Medicaid. **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators admitted or caused to be admitted many of Daybreak's PHP patients to those related businesses.

41.     **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators submitted or caused to be submitted approximately $15,447,207 in claims to Medicare for PHP services purportedly provided at Daybreak, which were often medically unnecessary, often not provided, or both. Some of those claims were also submitted to Medicaid for reimbursement.

42.     **GWENDOLYN GIBBS** and her co-conspirators transferred and caused the transfer and disbursement of illicit proceeds derived from the fraudulent billing scheme to herself, **CHARLES GUIDRY**, and her co-conspirators, many of whom were family members.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2–5**
**Healthcare Fraud**
**(18 U.S.C. §§ 1347 and 2)**

43.     Paragraphs 1 through 25 and 29 through 42 of this Second Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

44.     On or about the dates specified below, in the Houston Division of the Southern District of Texas, and elsewhere, defendants,

**GWENDOLYN ARNETTA GIBBS,**
**a.k.a. GWENDOLYN ARNETTA GUIDRY and**
**CHARLES JOSEPH GUIDRY, JR.**

aiding and abetting, and aided and abetted by others known and unknown to the Grand Jury, in connection with the delivery of and payment for healthcare benefits, items, and services, did

10

knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare and Medicaid as set forth below:

| Count | Approx. Date of Services Billed | Patient Initials | Description of Services Billed | Approx. Amount Paid by Medicare |
|---|---|---|---|---|
| 2 | September 16, 2013–September 30, 2013 | C.Z. | Group psychotherapy other than of a multiple-family group, in a partial hospitalization setting, approximately 45 to 50 minutes | $941.16 |
| 3 | September 16, 2013–September 30, 2013 | J.Z. | Group psychotherapy other than of a multiple-family group, in a partial hospitalization setting, approximately 45 to 50 minutes | $941.16 |
| 4 | October 1, 2015–October 30, 2015 | C.Z. | Group psychotherapy other than of a multiple-family group, in a partial hospitalization setting, approximately 45 to 50 minutes | $1,845.06 |
| 5 | October 1, 2015–October 30, 2015 | J.Z. | Group psychotherapy other than of a multiple-family group, in a partial hospitalization setting, approximately 45 to 50 minutes | $1,845.06 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 6
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

45.     Paragraphs 1 through 25 and 29 through 42 of this Second Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

46.     From in or around 2006 through in or around April 2016, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

11

**GWENDOLYN ARNETTA GIBBS,**
**a.k.a GWENDOLYN ARNETTA GUIDRY;**
**CHARLES JOSEPH GUIDRY, JR.; and**
**JUSTINA OBUMNADOR UZOWULU**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the grand jury, to commit certain offenses against the United States, that is,

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare; and

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare.

### Purpose of the Conspiracy

47.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the

referral of Medicare and Medicaid beneficiaries for whom Daybreak submitted claims to Medicare and Medicaid.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

48.     Paragraphs 29 through 42 of this Second Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

## Overt Acts

49.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

a.     In or around 2006, defendant **CHARLES GUIDRY** and patient recruiter S.M. agreed that Daybreak would pay S.M. between approximately $100 and $250 for each Medicare beneficiary S.M. referred to Daybreak for partial hospital services.

b.     Between in or around 2007 and in or around 2008, defendant **GWENDOLYN GIBBS** and her co-conspirators paid or caused the payment of over $8,000 in checks to patient recruiter S.M. in exchange for S.M. sending Medicare beneficiaries to Daybreak for partial hospital services.

c.     Between in or around 2009 and in or around 2010, defendant **GWENDOLYN GIBBS** and her co-conspirators paid or caused the payment of over $5,000 in checks to group home owner E.B. in exchange for E.B. sending Medicare beneficiaries to Daybreak for partial hospital services.

d.      Defendant **JUSTINA UZOWULU** owned, operated, and controlled two group homes in Houston, Texas.  In or around 2007, **JUSTINA UZOWULU** agreed with defendants **CHARLES GUIDRY** and **GWENDOLYN GIBBS** to refer Medicare beneficiaries to Daybreak for partial hospital services in exchange for payments and other inducements.

e.      On or about October 2, 2008, defendant **GWENDOLYN GIBBS** paid or caused the payment of approximately $600 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

f.      On or about March 2, 2010, a co-conspirator and family member of **GWENDOLYN GIBBS** and **CHARLES GUIDRY** paid or caused the payment of approximately $900 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

g.      On or about February 25, 2011, defendant **GWENDOLYN GIBBS** paid or caused the payment of approximately $450 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

h.      On or about September 27, 2011, defendant **GWENDOLYN GIBBS** paid or caused the payment of approximately $800 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

i.      On or about November 18, 2011 defendant **GWENDOLYN GIBBS** and her co-conspirators paid or caused the payment of approximately $900 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

j.      On or about January 23, 2012, defendant **GWENDOLYN GIBBS** and her co-conspirators paid or caused the payment of approximately $450 to defendant **JUSTINA UZOWULU** in exchange for **JUSTINA UZOWULU** sending Medicare beneficiaries to Daybreak for partial hospital services.

All in violation of Title 18, United States Code, Section 371.

## COUNT 7
### Conspiracy to Commit Laundering of Monetary Instruments
### (18 U.S.C. § 1956(h))

50.     Paragraphs 1 through 25, 29 through 42, and 49 of this Second Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

51.     From in or around January 2007 through in or around April 1, 2016, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the defendants

**GWENDOLYN ARNETTA GIBBS,**
**a.k.a. GWENDOLYN ARNETTA GUIDRY and**
**CHARLES JOSEPH GUIDRY, JR.**

did willfully and knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956, that is, to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

15

It is further alleged that the specified unlawful activity was to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1956(h).

### Purpose of the Conspiracy

52.    It was a purpose of the conspiracy for defendants **GWENDOLYN GIBBS, CHARLES GUIDRY**, and their co-conspirators, to engage in money laundering for the purpose of (1) unlawfully enriching themselves and their co-conspirators and family members; (2) furthering the healthcare fraud scheme by paying co-conspirators and family members to work at and run Daybreak, and transferring fraudulently obtained money to family-owned entities; and (3) promoting the health care fraud scheme by paying kickbacks, and directing co-conspirators and family members to pay kickbacks, in exchange for patient recruiters and group home owners providing Medicare and Medicaid beneficiaries to Daybreak, so that Daybreak could bill Medicare and Medicaid for services that were often medically unnecessary, often not provided, or both.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things,

53.    **GWENDOLYN GIBBS** caused Medicare and Medicaid to electronically transfer funds into Daybreak's bank accounts, which were controlled by **GWENDOLYN GIBBS**, as payment on claims Daybreak submitted to Medicare and Medicaid for PHP and psychiatric services.

54.    **GWENDOLYN GIBBS** transferred or caused the transfer of funds obtained from Medicare and Medicaid from Daybreak's bank accounts to herself, **CHARLES GUIDRY**, and other co-conspirators and family members; and to entities owned, operated, or controlled by

16

**GWENDOLYN GIBBS**, **CHARLES GUIDRY**, other co-conspirators and family members, including Gibbs Care Home, Visionaire, Remedi Plus, and Procare.

55.    **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and their co-conspirators and family members paid or caused the payment of a portion of the funds derived from the Medicare and Medicaid fraud scheme to pay patient recruiters, group home owners, and others in exchange for the patient recruiters and group home owners sending Medicare and Medicaid beneficiaries to Daybreak so that Daybreak could submit additional fraudulent claims to Medicare for PHP services and to Medicaid for psychiatric services that were often medically unnecessary, not provided, or both.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

56.    Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and **JUSTINA UZOWULU** that upon conviction, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment

57.    **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and **JUSTINA UZOWULU** are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, which is at least approximately $15 million.

(continued on next page)

## Substitute Assets

58.     **GWENDOLYN GIBBS**, **CHARLES GUIDRY**, and **JUSTINA UZOWULU** are

notified that in the event that one or more conditions listed in Title 21, United States Code, Section

853(p) exists, the United States will seek to forfeit any other property of the defendants up to the

total value of the property subject to forfeiture.


~ A TRUE BILL

_____ Original signature on File
FOREPERSON


ABE MARTINEZ
ACTING UNITED STATES ATTORNEY


ALEZA REMIS
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE